Ms. Powell. Good morning. May it please the court, the lower court's decision to Before you get started, just one note. Some of the documents that are in the joint appendix are virtually illegible. You really should be more careful in making sure that we have legible copies.               I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I didn't realize how bad the copies were until we actually started preparing for the argument. And I attempted to try to fix it, but the clerk said you already had the joint appendix. Okay. Well, go ahead. May it please the court, the lower court's decision should be reversed for two reasons. First, the lower court's failed to apply additional U.S. Rules of Interpretation 1a. That rule governs the classification of merchandise, the classification of imported merchandise in principal use tariff provisions. And the provision that's at issue on this appeal is a principal use provision. And that provision is preparations thereof. Can I just ask you kind of a process question? With regard to this, with regard to the evidence that there's a dispute over the declaration, whether it should be in and out and so forth, a question which the CIT did not reach. And you briefed it and you argued that it shouldn't be out. Don't we kind of have to resolve that? I mean, in other words, doesn't the government agree, if we were to let it in, at a minimum, there would be some disputed fact, right, at a minimum, in the government's view? Or what is the government, assume we decide it and we decide against you and let that information in. Where does that leave us in this case? What does the government want us to do? We believe that if you do, of course we do challenge the declaration, but if you do let it in, we believe that there's sufficient undisputed evidence to show that the court was wrong and that summary judgment should be entered in our favor. You're basically contending that the use evidence is irrelevant, right? Let me, I guess, go back. The problem with, the fundamental problem with the court's decision is the use evidence, but the real fundamental problem is the court's failure to apply the note and then go and do the principal use analysis. Here the court totally skipped over, which is essentially step one in any classification case, which is determine the meaning and scope of the provision and skip to the, what they call the actual use of the merchandise. And yes, we do have a problem with just relying on purported actual use of the merchandise. For example, Primal Light says that actual use is relevant to a principal use provision. The thing is, is that actual use, I would agree, we would agree, actual use is relevant, but in this context, in that principal use analysis, you need to know what's the class or kind of goods that we're talking about in the provision in order to determine whether this use or actual use is the same as the goods in the class or kind. Here the court just looked at sales material, which we did dispute, and decided that this actual use is dispositive of the entire issue, without going- The court didn't say anything about this actual use being dispositive. But essentially, it was dispositive. The court didn't, like I said, the court first didn't do what it's supposed to do, is define the scope of the provision, preparation, and so on. You can't even get to determining whether the merchandise falls within that provision without saying what that provision means. And that's with any kind of- I'm still confused. I mean, what Primal Light said is that it's interpreting carborundum. And what it says is that when you have a principal use provision, you look at the physical characteristics of the goods. One of the things that you look to is what goods with these physical characteristics are used for. And to the extent that the Court of International Trade said, well, these preparations are not a dispositive thing, why isn't that relevant under carborundum, under Primal Light? As I was trying to convey, is that it's relevant in the context of the principal use analysis in terms of knowing that use and comparing that use with the class or kind that's covered by the provision. In isolation, it really- it's not even a principal use analysis. You might as well ignore the note and ignore carborundum and just look at the use. I'm sorry. I'm not understanding. So, therefore, how would you- so you say it is relevant, but you just have to go the extra mile, do something in addition to that. And I'm not understanding it. You say it is- actual use is relevant if you do what? The way the analysis is supposed to work, according to the note, is that you look at the note and it says, you look at the tariff provision and you define what that tariff provision covers. Preparations thereof. What's the class or kind of goods covered by that provision? Where does the note say that's what has to happen? If you look at the language of the note- I've got it right in front of me, RE1A, right? Right. It says, a tariff classification- What page are you on? I'm actually just reading the note, but the note is actually quoted in the decision on page 14, A14 of our appendix. It says, a task classification controlled by use is to be determined in accordance with the use of the United States at or immediately prior to the date of importation of goods of that class or kind to which the imported goods belong. Right. But how does that- Right. That just says you, at the time of importation, determine if this is the same as goods of that class or kind. How do you translate that into some sort of mechanical requirement that the CIT or the customs agency must always define by giving examples, specific things that would fall within a use provision and then decide whether these things are the same as or analogous to that? I don't understand where the government has come up with this notion that somehow the CIT erred by not defining the class. The class is a principal use, preparation for soup. I don't understand what additional definition you wanted the CIT to come up with. I don't see any error in how they did this analytically. And that's really the heart of your problem, it seems. Okay. If you actually go to the decision, there's no discussion in here that the court even said or determined, made a determination as to what that- They determined this wasn't it. Why isn't that enough? This is not a preparation for soup. Not principally. It might be able to be used for that in a little bit of cases or some cases, but there isn't any evidence that it principally falls within that use. So I don't see the harm. Okay. So I will give you some examples. If you look at the Pistorino cases and the Carborundum cases, all the principal use cases, the Essex Manufacturing case, they all do the same analysis. They all, for instance, in the Minnetonka Brands case, the provision was toys. The court said, okay, toys. What does toys mean? It's something used for the amusement of children. Okay. But here, this is called preparation for soup. I don't see what additional discussion over that needs to take place. It's so plain and obvious on its face. The language itself tells you what principal use is. So toys, fine. If they want to go further and say things for amusement, that's fine, but I don't see why it's required. You're hinging your error analysis on some procedural defect in the CIT opinion. Namely, it didn't explicitly define in different words from the words that actually appear in the statute what class of goods should fall within here. The CIT saw it plain on its face and went ahead and applied it. I don't see what's wrong with that. And I don't see those other cases as supporting a requirement that they must do something different than what they did in all of these cases. What Primal Light and Carborundum say is in order to figure out whether something is within the class or kind of the tariff classification, you look at a number of factors. And those were summarized in Primal Light as to whether the thing is commercially fungible with the class or kind of goods in the tariff classification. And certainly, the actual use to which the goods are put has to be one of the relevant considerations in determining whether it's part of that class or kind. No? As I said, and I understand the Court's point, we're saying that it is relevant in the context of the principal use analysis, comparing it with the class or kind that's covered by the provision. Even assuming that actually we don't dispute the actual use, which we do, there are still many other factors that the Court never addressed in the Carborundum factors and that the Court doesn't sustain. We are dealing with summary judgments, so we can look at the record. And the record also shows that these products are much more costly than soup preparations. So, what are the considerations here, what are the Carborundum factors here that favor you? Certainly, actual use doesn't, cost doesn't, what are the other factors that favor you? Well, we put an evidence into the record that the actual use, and I understand the Court's position, does lean towards our position only because, and we put in the record, products that are principally used for preparations for soups and broths, that's not their only use. They can be used for other things. So, even if you agree that the product can be used for other things, I don't think that necessarily weighs in Aramont's favor. But going to the other Carborundum factors, we think the physical characteristics of the merchandise, that factor weighs in our favor. Why? You mean this is sort of a paste? Right. But if you look at the explanatory notes, it states that the products can come in many different forms. And the explanatory notes are guidance as to the scope of the heading that we're, that's that issue, 2104, it says it can come in liquids, tablets, cakes, cubes, powders. Here we have a liquid. So we believe that the physical characteristics of the merchandise falls in our favor. The expectations of the ultimate consumer, Aramont marketed its merchandise as preparations for soups and broths. They advertise it as it... Can I just go back? I'm sorry to interrupt, but I was looking for the explanatory notes. Yeah. Is this the explanatory, is this shown at page nine? I just want to make sure I'm looking at the same thing because I'm not seeing what you're referring to in the explanatory notes. When you say page nine of... Red, I'm sorry. But I don't know, you want to tell me where it is in the appendix or in your brief? It's actually in the back of our brief, the explanatory notes. It's the second appendix on the back of our brief. So is it page 179? I just want to make sure I'm looking at this. Yes. All right. So it's the 21.04. Yes. Right. Yeah. It seems to me the explanatory notes don't help you at all. I'm not seeing what you think in the explanatory. I mean, it says preparations for soups requiring only the addition of water and milk. And then the other one are... I mean, I'm not sure what in this explanatory note... Well, as we pointed out in our brief is that the explanatory note is guidance. And it says this category includes... It's not an exhaustive list, but it just sort of gives you some guidance as to what's included in the explanatory, what's included in the heading. And what is it about that that helps you? I thought you were responding to Judge Dyke's point about how this is not really preparation for soup or broth. And you pointed to the explanatory note as helping your argument. Right. I was pointing it to in reference to the factor for the expectation. I think it was expectation of the consumer and probably, most likely, physical characteristics. Okay. The explanatory note says preparations for soups or broths requiring only the addition of water or milk. The marketing material for Aramont states that it readily remixes with water and milk. If you want to add things, that's fine. But if there's no requirement that you need to add things to it. The other thing that we think that helps, favors the government is that it clearly states they are generally put up as tablets, cakes, cubes, or in powder or liquid form, which means that they can come in many different forms. And this is a liquid form. It's a thick liquid. But wait a minute. See, that makes it sound like from the explanatory note you get coverage of absolutely everything. I mean, soup in a liquid form, no one would construe that as a honey-like substance, a syrupy type of thing. So, I mean, your argument is, look, the explanatory note says it can come in lots of forms. You can't transition that into, therefore, the carborundum factors support the government. Because here, the liquid form it comes in is not really a liquid form people think of soup in. And so it's true, it's liquid, but you can't just say the umbrella covers everything, therefore, it supports the government. We're not arguing that it's a liquid soup. We're arguing that it's a preparation for a soup. So the liquid form, the viscous form, that's why we think it does favor us. Just like you can have the lipton soup. It's in a powder or other types of preparations. They come in different forms. And this one just happens to be one that's in a viscous liquid form. Okay, so what the physical characteristics, expectations of consumers, what else favors you? We also believe the channels of trade in which the merchandise moves favors us. There's evidence in the record that the merchandise was sold in retail establishments such as Whole Foods, and that's where other preparations principally used for soups and broths are also sold. I want to note that they also sell turkeys there. Does that make it fit into this category? No. Whole Foods is a huge grocery store that sells every different kind of food. The fact that these things are sold in Whole Foods transitions into support for the notion that it's a preparation for soup? See, I think that's the issue here is that these factors have to be compared with the products that are in the class. It's not an isolation of whether it's sold in Whole Foods that makes it fall within the class. It's whether the products that fall within the class, are they sold in Whole Foods? Okay, then let's move on to this merchandise. Is this merchandise sold in Whole Foods maybe in the same section? That type of analysis, not just, you know, if we have a turkey, it's in Whole Foods, therefore it goes into this provision. But right now, you have to overcome. You're the appellant. Yes. So you have to show us that there are facts in the record that support reversing below. Yes. And the fact that this product may be sold in Whole Foods in the abstract doesn't seem to me a fact that would support you being able to do that. That's what I'm trying to ask you to explain, how that supports reversing summary judgment. The other thing that, and on to that point, we also, at the lower level and in our joint appendix, we also have the affidavit of Stanley Hopart, who is our in-house expert on these type of products. And he actually does add some testimony to the fact that these products are sold in the same places as in Whole Foods, just like the products that belong to the class or kind. The other thing that I wanted to mention is that if you look at the sales material, they call these products stocks and consomme. A consomme is a soup. And so it's hard to argue that it's not a preparation for a soup when you're calling it a soup and you're holding it out to the public as a soup. Anything else? The other thing, the last thing I wanted to mention was that the economic practicality of still using the import is that Aroma actually puts itself out as using it for a soup and a broth. So there's evidence there we think that favors us in terms of the carburizum factors. Okay. Thank you. We'll give you two minutes for rebuttal. Mr. Scherer. May it please the Court. My name is Brian Scherer on behalf of Aramont. Aramont stands behind the lower court's decision and also the lower court's application of the law to the facts of record. Well, not so much, though. I mean your brief leads with you can decide this on other grounds, and everywhere you go in your brief when you're making your case, you're citing two appendices sites which reference the declaration and the evidence that the CIT never even relied on a reference. They relied on one thing, right, the 2003 seal numbers. And it seems like virtually all of your argument is predicated on all of these other things that are found in the appendix with regard to evidence and documents that the CIT never looked at. He said he never looked at them. Understood. Clearly, this panel can take into account matters of record that were not considered by the trial court below. Do we need to? We don't believe you need to. If you do, from our perspective, clearly the case should be affirmed. But even if you do not take into account any additional matters of record that were not taken into account by the CIT below, the court did in fact Are you suggesting that actual use is determinative and that we shouldn't consider the other carborundum factors? Absolutely not. To get to the other carborundum factors, don't we have to look at the record and determine whether this affidavit that you submitted should be admitted into evidence, right? The CIT below did take into account various carborundum factors. It was not just simply actual use. But in terms of the record as to those, isn't all that information largely from that declaration that you submitted? It is largely from that declaration. And this court determines that the declaration is improper and that issue has been briefed. And we would continue to argue that that declaration is completely proper as a 30B6 witness. Did you say the court determined that was improper? No, no, no. I did not. I apologize. The CIT never relied on it, though. The CIT didn't rely. The CIT, rather, relied upon documentation, those of record, some of which Mr. Zatoun testified to in his deposition, some of which Mr. Zatoun averted to. The 2003 sales figures, right? Correct. The 2003 sales figures are one such document. We have Mr. White's deposition testimony, who was a contemporaneous managing director of the company during the relevant time periods, who also testified to the types of sales that occurred during that time, the customers, their uses of that product. The 2003 sales figures. How did he know what the uses of the product were by the customer? He was the vice president in charge of sales. He was the one that sold them to the very customers. And he didn't say that he spoke to the customers? How did he know? That was his job. I mean, his job as vice president of sales was to go out. In fact, he pointed out that these products often required point of sale where he had to go into the customer specifically and design specific products for that customer. I thought somebody admitted in there, and there was some deposition or declaration testimony where, and I think the government points to it, where the person on your side said, well, I can't really attest to the fact that somebody in their home actually put it to this particular use, which makes some sense to me because he's not there. He doesn't have firsthand knowledge of what every customer does when they take it home. So I thought the evidence kind of went the other way. I respectfully disagree. You're absolutely correct in that there is testimony that one would not know, that Aramont does not specifically know what every end user, so the person that happens to buy the stock product at Whole Foods, what that customer may use that product for. Most of this stuff is sold for frozen TV dinners. Exactly, Your Honor. So, I mean, if they're selling it to Pinnacle Foods for use in their frozen dinners and they're supplying literally large 12-kilo pails, they're aware, and Mr. White testified to that, they're aware of how that is used in that fashion. So the fact that we've got a handful of potential small uses as a soup or broth or preparation therefore is not dispositive, and Carborundum specifically holds that. Well, but as Ms. Powell points out, your own advertising stresses the availability for use as a broth and expressly says right at the top of the advertisement, honey-like consistency that readily remixes with water to develop traditional stocks and broths. I mean, that's, in fact, one of the very first uses that you list in your advertising prospectus on page A63 for the product, and that seems to me that she's making an awfully good point. It's kind of hard to say it doesn't fit within the explanatory notes with advertisement like this. Your Honor, simply advertising, if we could advertise and have it be so, that would be great for all the advertisers of the world. The reality here is that the actual use of our product was not as a soup or broth. Well, that's actual use from 2003, and quite clearly the statute says we've got to look at the year of importation, which is 2001. So while I'm not saying it's irrelevant, it certainly isn't anywhere near dispositive. And when one of the primary uses that you suggest in your own advertising prospectus is exactly to use as preparation for soup or broth, we've got to figure out, is that to make it the principal use? But still, you can't run away from your own advertisement. And P.S., you could also think of using this as soup. I mean, it's pretty prominent in your advertisement. If you look at the various advertisements, including all the recipes, you do come away with the possibility that it can be used as a soup. Is there anything in the record to show the date of these advertisements? Because I don't recall seeing that, and I can't find it on any of the documents. I mean, as Judge Moore just pointed out, we've got to look at it. Did they concede that these were at the relevant time period? That these were advertisements used during the relevant time period. And Mr. White further testified, although we acknowledge that the document that you're focusing on, the 2003 sales records are 2003 and also contain references back to 2002 sales figures in the prior year column. We would also point out that Mr. White testified as to the types of customers that were in place throughout his time period, which included the 2001. And he identified the fact that he had industrial customers and food service customers, which made up more than 80% of the total sales by era of these products. So now we've got the possibility that maybe among the less than 20% of the sales that are occurring through retail stores, such as Stop and Shop and Whole Foods, that maybe some portion of those people are using it as a preparation for a soup or broth. That in and of itself will not rise to the principal use analysis required here. Well, I imagine you would agree that it's possible that something's principal use could be clearly one thing, but that maybe one big customer could buy all of them and use it for something else, right? Isn't that possible? Absolutely. And Primal Light and Clarington Marketing, for example, specifically point out the use of a race car for advertising purposes and the fact that it still is a race car. But that's not what we have here at all. And in fact, the Primal Light decision, we would argue, is spot on here. The Primal Light court specifically rejected the same reasoning. Why isn't all this a fact question, though? That's what is concerning me. Both parties seem to think there's no dispute of fact and each person is entitled to summary judgment, but it seems like all the things you're disputing are facts. What is the principal use of this? Well, the advertising says soup. Your guy says in 2001 people weren't using it principally for soup. Why doesn't that make this a factual question? There is no evidence that the principal use in 2001 was as a super profit preparation, therefore. Absolutely not on the record. What about the declaration by the government witness that your friend referred us to? Mr. Helper has no knowledge and is unable to testify specifically as to 2001 as to how the Airmont products were used. The only evidence out there is Mr. White's deposition testimony, is Mr. Zatoon's deposition testimony, Mr. Zatoon's affidavit, all of which are consistent on the use of the product in 2001. What page of the appendix is their declaration in? Sure. Mr. Zatoon's affidavit is at 8256. Yeah, but I'm talking about their declaration. I'm sorry, Mr. Hopart's declaration? Yeah. Mr. Hopart's declaration, I believe it's 87. It's 84. Very quick, thank you. Great. 88. Thank you. With the lower court's finding that this product is used in a variety of ways and therefore 2106 rather than 2104 is proper. Going back to the Primalight decision and our position that Primalight directly supports what the evidence, the affirmation of the CIT opinion. The Primalight court specifically rejected the government's rationale that actual use somehow should not come into play here. I'm quoting. What the government, in effect, urges is that the class or kind of good referred to in ARI 1A comprises not the particular species of which the merchandise is a member, but a much broader genus to which that species belongs. The government's construction would make it impossible to determine with confidence the scope of any principal use provision since the scope of the provision would depend on how broadly customs chose to characterize the genus. I don't think that the government actually argued you can't look at actual use evidence. I mean, we went through that with Judge Dyke quite extensively in this oral argument. I think that her complaint, as I understand it, is the only thing cited by the CIT judge for support was not Mr. White's declaration, which you correctly point out goes back to 2000 and 2001, but actual use evidence from 2003, which is kind of a hard thing to base summary judgment on given that we're supposed to be looking at the 2001 timeframe. Maybe I'm misunderstanding her argument, but that's the way I understand her argument. The lower court also looked at the physical characteristics of the merchandise, talked about the laborious complex process that goes into making this product, talked about the guillotining of bones and the slow roasting and the multiple days that goes into this, and that is not based upon the 2003 document in and of itself. So there was more than – the CIT did address below more than just the actual use test portion of the carborundum test. It went through and talked about the physical characteristics of the merchandise, the expense of the merchandise, and it went through several of the carborundum factors and concluded with respect to all of them that the government's position was improper and Aramont's position was correct. Can I be clear on the – there are several documents hanging out here. There's the declaration of Mr. Zatoun and the attachments. There's a supplemental declaration, and then there's another declaration by another one of your – is it Mr. White? I'm sorry. There's an affidavit. Affidavit. Okay. No, no, no. There's deposition testimony of Mr. White. That's part of the record. Correct. Deposition testimony of Mr. White, deposition testimony of Mr. Zatoun, declaration one of Mr. Zatoun, which the government challenged at a late date, which then resulted in our seeking as well. Yes, but I'm talking about what the CIT had before, and I thought the CIT quite clearly said that they weren't considering the issue that was – the matters that were at issue. Yes, understood. The White deposition and the Zatoun deposition in and of themselves more than provide – And those were in. Those were in a matter of dispute. So what was disputed? The declaration, the subsequent declaration of the – Portions of Mr. Zatoun's declaration. Declaration. And then there's even a supplemental declaration. That wasn't – when was that – that wasn't even presented to the – That was presented to the court below. And then what did the court say about that? Consistent with its decision that it was not going to consider the government's motion to strike because it didn't rely upon the initial Zatoun affidavit, did not reach a decision on the need for supplemental affidavit. So we know they didn't look at the supplemental declaration. Correct. It's part of the record, but no, they did not look at it. Did Zatoun or White in the deposition testimony state that the 2003 uses were typical of the period in question here, 2001? Mr. White specifically, based upon his own knowledge, testified that the types of products and the uses during the entire relevant time period. He didn't need to focus – Where does he say – where does he tell us that the uses during this entire time period were not primarily for soups but were for other things? The White deposition, which is at 8.320 and 3.21 of the record. Describe the bones and the stock, and then further at – He talked about – at page 77 through 80 of his deposition at 8.332. He was shown the same exhibit, and he said he's seen that. And then he just went on to describe the fact that the sales in prior years have been extensively focused on the industrial uses as well as the food services. Where does he say that? Could you be looking for 328, page 63, the top right-hand side? Is that – Thank you. Yes. That may be what you think. I'm not sure. Yes, that is part of it. I apologize. We're all working from a very poorly copied record. Obviously, if the Court would like, we're more than happy to work with the government in making sure that the record is one that's legible. Why don't you submit something that is clear of where – because we're going to have to read this. Particularly, the sales figure data is illegible. Understood. Let's just submit a supplemental appendix. Of course you will. But I want to make clear of Erma's position on the sales figures. The actual sales numbers, whether it's X dollars or Y dollars, are not all that relevant here. What's relevant is – The sales figures don't show the use? The sales figures specifically show who they were sold to, but they don't specifically identify how that customer used it. That's Mr. White's deposition testimony in talking about the use by these customers as flavor notes, as flavor profiles. The use by Pinnacle as a flavor note for their TV dinners. So that's where the real driver here is. It's not whether there are $350,000 of sales in a given year or $300,000 of sales in a given year to any given customer. Okay. Thank you, Mr. Shurer. Ms. Pally, you have two minutes. Thank you. I would like to address a couple of things that were said by counsel. The court brought up the issue of sales figures for 2002 or 2001. And that was expressly asked to Aramont's witnesses about whether they had the 2001 and 2002 figures. And for the White deposition, that appears on page 330 of the record. Where I specifically asked him about the first 2000, then I went on to 2002 and 2001. And he, if you read it on page 330, the upper right-hand corner, he does not have the sales figures. He's remembering and trying to ballpark what they, not even the figures of what he can remember of the sales. And then for Zatoon, with respect to the sales figures, if you look at the record on page 8291, again, there are no sales figures for 2001 or 2002. But do you have any reason to believe that the 2003 sales figures and uses are atypical and that 2001 would be any different? I do. The first reason that I have is that if you look at the sales figures, and again, I do apologize for not having the clearer documents, and we will produce them to the court, but the documentation just has customer actual, budgeted and actual figures. Aramont sold a lot of different products. There are some products here that aren't even at issue in this case. There are easy sauces, gravies, and then there are products that are issued here. So without some sort of evidence to show exactly what were used and how they were used, that's an issue we have with the 2003 sales material. So yes, there is a question as to what the actual use of the product was. We need to figure out whether it was the product, that issue in this case. The other point I wanted to make is that counsel had made the statement that the court looked at all of the cabaranzo factors, looked at the physical characteristics. The court went through, in the beginning, sort of its background section, and that's where the court went through and digested all of the facts that the parties could agree on. But it didn't do it in the context of a principal use analysis and arrive at a finding. The last thing I wanted to mention is that the decision is pretty telling, and I understand the court's views, but to us it's pretty telling how long it is. Just by reading some of the statements in the decision, on page A14, the court says proper classification turns on the principal use of the subject merchandise, which is directly at odds with Claritin marketing and some of the other cases. The other statement that I wanted to point out was on page A15. It says, in this case, at bar, Aramark's products are not principal use as soups and broth. I think those two taken together... Yeah, but it's de novo review. We can look at the records. It's a summary judgment. We can make a determination. The fact that the Court of International Trade may have said something that's incorrect doesn't really affect this because the Court of International Trade is not making fact-finding. It's a summary judgment, right? Yes, I agree. I just wanted to make sure that the court was aware that we wanted to point those statements out and not give an indication as to where I think the court was going with its analysis and how it ended up with its analysis. For those reasons, Your Honor, we think that the lower court's decision should be reversed and summary judgment entered in our favor. Okay, thank you. Thank both counsels. Thank you. Case is submitted.